First case on this afternoon's docket is the case of re Marriage of Bradley Jackson and Michelle Jackson. We have Mr. James Drazen for the appellate and Mr. Sam Brandmeier for the acolyte. You may proceed. Thank you, Your Honor. Justices, Mr. Brandmeier, may it please the court, my name is James Drazen and I represent Mr. Brett Jackson in this appeal. This is a case involving a child custody matter, among other things. And I think a little bit of information regarding what actually transpired in that series of events is necessary for us to initially focus on the various factors that I've identified in my brief. First of all, the parties were married on September 17, 2005. Very short term marriage. Shortly before that, Mr. Jackson initiated a business known as Tint Pro. It was in the business of tinting windows for vehicles. A petition for dissolution of marriage was filed on December 4, 2008, about a year and a half, a little more than a year and a half after their only child, Garrett Jackson, was born. During the time the proceedings were going on, several temporary orders were entered. The first temporary order was entered on June 12, 2009. It provided the parties would have joint custody of the minor child. It also provided basically a 50-50 split of time with the child and provided for no child support. After that, an order was entered on March 1, 2010 after another temporary hearing that changed the order with regard to support and was based upon certain factors that the court initially stated were brought forth at that hearing. Less than 30 days later, the court entered a sua sponte order on March 23, 2010, and that's the subject of the appeal issues with regard to the contempt findings. But the first and foremost issue on Mr. Jackson's plate, the appellant's plate, Your Honors, is the issue of custody. As this court is well aware, the factors are set forth in 750 ILCS 5-602. Those are 10 factors that are applicable, and the court is required to consider those factors in every child custody proceeding. Do you believe that the court has to identify how it applied each of those factors? Absolutely not, Your Honor. I don't believe it does have to do that. But I believe the law that I've cited in my case, in my brief, as well as the prevailing law, is that there must be some finding in the order or in the record that the court did in fact consider those. When you look at the order on its whole, on its face, you can tell that the court didn't consider those. I agree with that. I looked at the order. I have it. But I don't know what the record showed. Did the judge articulate at some point? None, Your Honor. There is no situation at any point in time where the court said, on this factor we're looking at this, on this factor we're looking at this. And, of course, the appellee's brief doesn't point to any such record either. There's no identification of it. The court in this particular case looked at other factors, one of which was being the fact that what the court believed was the timing of my client's desire to obtain custody. In fact, in the petition for dissolution of marriage, as I pointed out in my brief, he asked for custody of his child. In June of 2009, they had joint custody of the child. And yet the court said, in its final order, it's the timing in which Mr. Jackson asked for the custody of the child that he finds very probative with regard to this issue. The court found, the court really only addressed one of those factors. The court, I think, failed to address several factors which applied. Of course, all factors don't apply in all cases. But certainly, the question of mental health was at issue in this particular case. It's pointed out through the record that Ms. Jackson had attempted suicide on two different occasions. And while those were somewhat distant in the past, it was also brought up that there was never any treatment for those. That was brought up in conjunction with her own testimony where she admitted striking her daughter, not Mr. Jackson's child, by a prior relationship on different occasions and, in fact, striking this child as well. Those factors together, the mental health of the parties and the physical abuse was never addressed at any point in time by this court. There is no doubt and there's never been any allegation that my client had either a mental health issue or an issue of physical violence, whether directed towards the child or directed towards somebody else. So those factors were unbelievably important. But probably the most important factor was the ability of the parties to cooperate, the ability of the proposed custodial parent to cooperate with the non-custodial parent. Substantial testimony was taken in this particular case about Ms. Jackson denying my client time with the child at Christmas, at Thanksgiving, even though he had Thursdays and holidays weren't set forth. She denied visitation during those times. She made unilateral decisions regarding major decisions for the child, like who the child's doctor was, changing the child's doctor, where the child was going to be sent to preschool. Mr. Jackson had a problem with the daycare provider in her own home, and the court pointed out that it was interesting that Mr. Jackson didn't have that problem until he was ordered to pay child support, when in reality the testimony shows that it was about nine months later that he'd gotten information that there was a problem in the home of the daycare provider, specifically with the daycare provider's daughter, and there was criminal activity going on, or criminal activity at least alleged, that brought him to have that concern. Nothing was addressed with regard to that in the court's order also. But the court did address one of the issues kind of in a roundabout way. The court did address factor number four, the child's adjustment to home, school, and community. The way the court addressed that factor in a roundabout way was the court found that during the pendency of the action, the respondent, Ms. Jackson, had moved from place to place and had lived with different men during those time periods. Mr. Jackson, of course, stayed in the marital home throughout that time period and had no other people living with him other than Garrett. The court identified indirectly that that stability factor, that important stability factor, actually favored Mr. Jackson. So in essence, in the court's order, the only factor out of 602 that the court actually addresses is the factor which most strongly favors an award of custody to Mr. Jackson. It is based upon those factors, Your Honors, and the fact that the court did not address the other factors in any way, shape, or form, that we believe that that decision with regard to custody must be reversed and remanded. And we would ask that the court be instructed to award custody, or at least primary custody, to Mr. Jackson. The second issue that the court addressed was the issue of child support. And I think the child support and the contempt issues are kind of where the court kind of focused its attention throughout this proceeding and to the detriment of the custody question itself. An analysis of that, again, requires going back to the original temporary order. The original temporary order entered in June of 2009, called for the parties to have joint custody. My client had every Thursday, Friday, and alternating weekends. Mr. Bramar's client had Monday, Tuesday, Wednesday and alternating weekends. Approximately a 50-50 split and ordered no child support. Thereafter, the appellee filed a petition for child support. That matter was heard in February of 2010. In March of 2010, the court entered an order. In that order, the court said that the most telling reason for entering an order for $750 a month in child support was the party's 2008 tax return. Now, it was important to note that at the original hearing, the February 5th hearing, it was indicated that that was a draft. It was never filed. And, in fact, it wasn't even prepared by the party's accountant, Mr. Johnston. The court still said that was the prevailing factor in its order of March 1, 2010 in saying Mr. Jackson had $84,000 in income because that draft tax return said that the company had $84,000 in income. And ordered Mr. Jackson to pay $750 a month in support. This, again, while he's providing for the child almost half the time in the merit of residence. The court then came back and entered another order almost directly contrary to that less than a month later. Suis Ponte, the court entered an order saying it cannot properly determine proof of income. The information that's been given is insufficient to determine income for the purposes of child support. And the court even highlighted that particular paragraph as paragraph 3. In addition, the court ordered the parties in that same highlighted paragraph to complete their 2008 and 2009 tax returns. Now, that would tell anybody that that 2008 tax return that he had relied on previously, he's now saying, well, that was just a draft. It wasn't valid. I can't have that. I don't have enough information on which to make a determination with regard to child support. But in its final order, the court says that Mr. Jackson's reliance on the court's March 23rd order was a bit of a red herring. He should have still paid child support according to the March 1st order anyway. And I'm going to get to that issue when I get to the contempt issue later on. However, it's important to note that the court said in that same March 23rd order the party should consider retaining an expert for this cause. We did. We brought in the accountant himself. He was qualified as an expert witness. He testified for almost a day. And when the court entered its final order, it said something to the effect of, let me quote it exactly, I think, because I'd rather do it that way if I could. He said that the evidence at final hearing was essentially identical to that previously presented. This comes after an entire day of testimony from Mr. Johnston as to the workings of this company in 2008, 2009, and the first four months of 2010. During that time period, Mr. Johnston testified unrebutted. And the evidence and the exhibits verify that, that the company was virtually broke. He said that it virtually had no value other than Mr. Jackson himself. He testified that the income for 2009, the gross income, was only $44,000. And that Mr. Jackson's income for the first four months of 2010 was $4,700 gross. From that, Judge Middendorf, in his order saying that the testimony was essentially identical, reiterates the $750 a month child support order, which would be approximately 60% of Mr. Jackson's net income as defined by statute. And there's no basis given for that other than Judge Middendorf decided that Mr. Jackson hadn't done what he had originally said or what he had originally intended. And therefore, he was going to punish him by keeping it in the same place in spite of voluminous testimony. Clearly, the longest testifier in this whole trial was the accountant who testified on and on and on about the different factors, both on cross-examination and on direct examination. Nothing was rebutted from what I've just indicated to the court. So therefore, the issue of child support must also be reversed because it is not based upon the evidence or the testimony. And it's clearly not based on the evidence of the testimony. But what it does is it allows the court to get into the third issue, that issue of contempt, which I believe, Your Honors, was probably the most important issue to the trial court at the time of hearing of the final hearing. The court found Mr. Jackson in willful indirect civil contempt and issued a minimus without a purging clause in it in January 2011. He issued it because Mr. Jackson hadn't paid support and said that there was no just reason for him to conclude that his March 23rd order that said there is no way to determine support was an admonition to the first order or a clarification of the first order that child support couldn't be determined, if at all. The most important thing was punishing Mr. Jackson. The court found Mr. Jackson in indirect civil contempt and again, as I said before, gave no purging provisions. I quoted the Steinberg case in my brief, which says that before a person can be subject to contempt, the order must be so specific and clear that it's susceptible to only one interpretation. I would submit to this court that there is no doubt that the order of March 23rd is susceptible to only one interpretation, but that it does, in fact, vacate or modify or terminate or stay that order of March 1, because the order of March 1, according to what the court said, was based on that 2008 tax return it received then, which it knew was not a true tax return. The March 23rd order said I can't determine income and go out and complete your 2008 and 2009 tax returns. So there's no doubt that Mr. Jackson had a good reason not to pay support, but what he did was he fell back to the 6-12-2009 order, the old 6-12-2009 order, which was the original order of the court. It was not the trial court's order. It was a different judge's order. But the court decided to look beyond that problem that it created and just hold Mr. Jackson in contempt. If you look at the original order, you look at the March 23rd order, you can only find that Mr. Jackson was validating his concerns as to what was a proper amount of child support. The court said I can't determine child support, but then the court later on said, but you should have paid $750 a month anyway. And the court heard later testimony from an accountant, which clearly negated the obligation to pay that kind of child support, and the court said it was basically the same as we heard previously when we had no accountant testimony. So that contempt order, Your Honors, we believe should be reversed and held for naught. Next, the court determined the issue of attorney's fees. And again, in a manner that appears to read like it's trying to punish Mr. Jackson for proceeding on issues that he's validly got a right to go forward on, the court entered an order compelling Mr. Jackson to pay $7,500 in attorney's fees. The court did not address, as Section 508 says, the inability of the party seeking fees to pay, or the ability of the party upon which fees are sought to pay. He disregards that completely, but he creates his own rules, and he says basically, the problem resides in Mr. Jackson A having to be used on enforcement proceedings. The only enforcement proceeding was included in the final hearing, so there was no extra case there. And because Mr. Jackson decided to prolong the litigation needlessly by additional efforts. Those additional efforts were seeking custody and bringing in an expert. The expert was requested by the court. The court reserved the right to appoint one if we didn't bring one in. So there was no basis for that. In fact, there were unpaid taxes that the parties couldn't pay. There were unpaid loans to the appellant's parents that couldn't be paid. The house was in foreclosure and could be paid, and there was no money to do any of that. The court clearly said the parties had spent beyond their means originally, but the court still found that Mr. Jackson should pay $7,500 of Ms. Jackson's attorney fees. He did not cite the appropriate law. Thank you, Your Honor. Thank you. You'll have the opportunity to vote. Thank you. Thank you, Your Honor. Mr. Drazen, may it please the court. The way that Mr. Drazen characterizes this hearing is, of course, we're at issue with. This is actually the story of Brad Jackson and Michelle Jackson and Gary Jackson. And if the court were to take everything that Brad Jackson has suggested, Brad Jackson is suggesting that over a two-day trial, as Mr. Drazen had pointed out, plus other hearings that lasted over a two-year period, Judge Mittendorf got everything wrong. Let me interrupt you. I don't know that you guys are wrong, but the 602 factors are nowhere in that order. I agree that they're not in order. However, the Raymer case, I believe, is interpreted to suggest that it has to be apparent from the court record that those factors were considered. And in this particular instance, the court did consider all of those factors, including the guardian ad litem's recommendation that Michelle Jackson have sole custody. And the guardian ad litem's recommendation was based primarily on the assertion that, of all of the factors in 602, number eight, which was which party will foster, of course, paraphrasing, foster a relationship with the other parent, which one of those parties is going to succeed in doing that. The guardian ad litem found that Mr. Jackson certainly would not. The record supported that. The guardian ad litem did find, however, that Mrs. Jackson, Michelle, would do that. So the court did, in fact, consider all of those factors. The court also considered a lot of other factors which are not brought up in the appellant's argument naturally or the appellant's case today. Primarily, how this relationship ended was that Brad and Michelle were living together in a marital home. When Michelle left Brad, Brad changed the locks. Brad had all of the marital assets with him. Brad refused to pay Michelle any child support, even though Michelle had no means of support. Michelle took a few hundred dollars with her. Brad made an issue of this at the trial that he took a few hundred dollars. Over the course of the two-year period from the time that Michelle and Brad were separated, Brad paid Michelle $750. He characterized $600 of that as a quote-unquote distribution from this defunct corporation that they had. Now, prior to the breakup of their marriage, these parties were actually living fairly well. However, the court recognized this factor as being very important. This company that they had, which was a window-tinning business for automobiles, was bringing in well over $100,000 a year. Brad and Michelle were able to use that money, even though at that time it was an incorporated entity. They were using it as if it was their own personal checkbook. The court specifically stated that those two, while they were married and after Michelle left, that checking account was used as if it was a personal account. After Michelle left, Brad continued to write payments out of that same account for his mortgage, the mortgage on his home, for vehicles. He, at one point during the litigation, purchased a vehicle that he said was valued at $37,000, a GMC Yukon. He put a $5,000 deposit on that. He paid for his cell phone bills. He paid for trips to Show Me's and Hooters and other restaurants. He took trips for that money. He paid his own home's utilities out of that. One thing that he didn't pay, and the court recognized all of these factors, was he refused to pay the second mortgage on that marital home. Why? The second mortgage has Michelle's name on it by herself. He refused to pay Michelle any child support for the two years that they were separated. However, he continued to make regular monthly payments to the mother of his other child living in St. Louis County. There was no child support order in effect. There was none. There was joint custody. Not initially, Judge. He entered an order, and the judge, and then within the same month or shortly thereafter, vacated the order. Well, actually what happened, Your Honor, is that the original order for joint custody was an accommodation. It was an agreed order of joint custody. This predates Mr. Grayson. I was in that case at that time. After that was done, we filed petitions for temporary relief. In order to establish child support, we filed petitions to get into the business that Michelle was also locked out of in addition to the marital home. Finally, when we got in front of Judge Middendorf for the issue of child support, Judge Middendorf issued this order establishing amount of child support. And then the second order that he issued, he didn't set it aside. We interpreted it as this. The judge heard the testimony at that temporary support hearing and made a determination that if we're going to figure out what the final child support amount is, we need more evidence. The court's order did not specifically set aside anything. It was a clarification and actually an admonition to the parties that they need to come up with some evidence. Michelle was out of the house for two years. The only evidence that we had and the only evidence that was produced by Mr. Jackson were the company's quote-unquote books and records. So does the court's order say, while it's insufficient evidence to determine the amount of support, the amount of order is still in effect? That's how we interpret it. But that's not what it said. Well, I believe—well, it didn't explicitly say that, Judge. What it did say was that there is going to be more evidence necessary in order to figure this out later. And he didn't say, therefore, I vacate the 750. Did not say that, right. Judge Minendorf was actually pleading to the parties and told counsel and I privately that in order to establish anything, he recognized that the books and records of the party were just a shambles. All he had to go upon was the income that both of them, when they were married, were using to pay every important debt out of their relationship. And then Mr. Jackson's assertion that somehow after he pays his mortgage, after he pays his utility bill, after he pays for the three vehicles that these two had— and by the way, he didn't pay the vehicle on Michelle's after she was ordered to receive it and he was ordered to pay it. He let that one go. But he continued to pay other bills. He paid the Verizon bill and every other utility bill. And after all of that's over with, he says that he makes, I believe the figure is somewhere in the $400 range as his paycheck every two weeks. It's disingenuous to say on the one hand that I can pay my mortgage, I can pay all of these other debts, and then somehow my income for tax purposes is only X. What Brad Jackson also failed to do was not only pay the child support, but he was ordered explicitly to pay for this vehicle that Michelle had been driving. He failed to do that. That vehicle had to be taken back by the lender. That was the same vehicle that Michelle used to transport their child around. The court can take into consideration things of whether or not a person is paying child support, whether or not a person is trying to support or help the lifestyle of the child. And clearly, by letting the vehicle that the mother is driving get taken back by the lender, that doesn't help anybody. Michelle had to end up getting a loan from her former husband for the sum of $1,500 to pay for a used Hyundai Elantra. Concurrent with that, Brad used the company funds to put a $5,000 down payment on a $37,000 vehicle. That's not my testimony. That was his. The court listened to all of this, was quite frankly, and I agree. The court was probably upset with this because it's unconscionable in most people's minds. He refused to let Michelle have any access to the business. So she had, quite frankly, if I were to say it this way, had to live other places. She couldn't get in the marital home. He had it locked up. She had to find someplace else to live. Mr. Drazen's client tried to suggest that because she didn't have any place to live, that somehow suggested instability. Mr. Drazen's client also decided that issues that she had that he was aware of prior to the marriage, such as an attempted suicide, was somehow now relevant to raise their child. It's a typical nasty custody case where one party says, let's see what kind of nasty stuff I can dredge up with regard to my wife that is trying to take our son away. Oh yes, she tried to commit suicide before we were married. Things of that nature, Judge, just should not fly in this case. And quite frankly, I believe that Judge Middendorf did find all of this unconscionable. Judge Middendorf did say at one point, and I believe that is reflected in the record, that he wasn't really too happy with either one of them. But based upon… He called them narcissistic, self-centered, and immature. Without question, yeah. Obviously, I don't take the same position of my own client that way, but that was his opinion. But in spite of that, he still granted custody, sole custody, to Michelle Jackson. So to suggest that he somehow did not consider the factors when he comes up with a personal opinion that is so negative about both of them as a group, I think he heard everything. I think, quite frankly, he was just upset by the whole thing. Now, the issue of indirect civil contempt, it's somewhat amazing that that even has to be discussed because Mr. Jackson didn't follow anything, didn't follow any court order. After the court entered its order, he didn't do much to set it aside. He did at one point when Judge Becker, early on, ordered that he pay child support and that he also pay… Excuse me, not child support. He was to pay $4,500 out of the company account, and it would be not stated whether or not it was child support or attorney's fees or property settlement. Judge Becker made that order. And he also ordered that Brad pay for Michelle's vehicle. And as I previously stated, Brad didn't even do that. He did file a motion to set aside, quote-unquote, post-trial order, I believe is what he called it, and never litigated that issue. Most notably, with regard to the attorney's fees, the court record shows that the court was really just kind of fed up with how Brad Jackson was handling this case. This was something that really shouldn't have lasted two years, but it did. Brad filed, I believe, five motions for continuance, and in one instance, right before the date of the trial, filed his amended answers to interrogatories disclosing a number of witnesses that we had never heard before, and one of which was Michelle Jackson's former boyfriend. There was another continuance. It was another way to delay this whole thing. With regard to, and let me back up for a second on that issue, the court can consider which party has the ability to pay and which does not. In this particular case, the court considered the other factor, which is who escalated the litigation? The court specifically said that he did. Because Michelle Jackson, as she did at trial, she said, I don't want any interest in the home. I don't want any interest in the business. You can have it all. And that was her position from the outset. Why that was litigated, why there was an accountant brought in, it's really up to Brad Jackson to answer that. Now, with any property that someone has allocated to them in a divorce that they accept, such as the business and the marital residence and things of that nature, they should also take the debts that go along with it. Okay? The debts that Brad tried to bring out at trial with regard to the business were phantom loans that were provided to him by his parents and I believe his grandparent. There was never any promissory note signed. There was never any explicit agreement to repay it. I believe in one instance he may have even placed that check into his personal account as opposed to the business account. And I think what it's also telling is that for a year while this litigation was going on, this tinting business, which at one time while they were married was incorporated, is no longer incorporated. So Brad Jackson was clearly, factually and otherwise, and legally doing business as something he was holding out as a corporation. He was clearly using this bank account all along as his personal bank account, sometimes averaging over an eight-month period of time, I believe, at $10,000 a month he was bringing in money, paying all of his personal debts out of it. If we're in the order, does it say that Mr. Jackson escalated the litigation and therefore an attorney's fee should be awarded? Is that in there? Let me see if I can find a judge. And I agree that if that happened, that would be correct, but I don't see it. He referred to his financial decisions being selfish. It's all right. We'll find it. I apologize if it's not in there, but I do believe that it was in there. Your Honor, this is actually a case that probably should have been a lot more simple than what it turned out to be. I can suggest that certainly unless the court fell asleep, the court listened to every bit of evidence that was produced to it. The record will reveal that there are some pertinent portions of it affecting child support, custody, attorney's fees, and things of that nature. Certainly, considering the standard of proof that Mr. Dreze's client has to attain, I believe that this court should affirm the court's decision. Thank you. Thank you, Mr. Brandenmeier. Mr. Dreze, you may be followed. Thank you. In fairness to Mr. Brandenmeier, the court did say that Mr. Jackson caused a serious escalation in the cost of litigation. He did, Your Honor. He identified three things. He talked about the relative income of the parties, and the relative income of the parties at the time of trial was that my client was making about $1,400 a month and Ms. Jackson was making about $1,600 a month. Then he said while it was not possible to apportion precisely the significant portion of this proceeding has been dedicated to enforcement of prior orders, there was none. And then he said Mr. Jackson caused a serious escalation in cost of litigation. Now, we've now found that the cost of litigation were bringing in the accountant, which the court said you should be bringing in. And that's exactly the problem that we've got with this case, Your Honor, is Mr. Brandenmeier, on behalf of Ms. Jackson, is referring to things that aren't essentially accurate. He talks about something called phantom loans. There was documentation. There's exhibits of those loans. There's checks made payable from Ms. Jackson back to mom and back to dad of Mr. Jackson for those loans. Where she identifies them as loans, there's letters identifying them as loans, and those are never apportioned. And in addition to that, she only indicated she'd waive her interest in the business if Mr. Jackson agreed to take on all debts, including those loans and including the taxes, which Mr. Jackson didn't believe was fair and equitable. If that's escalating the cost of litigation, then I believe Mr. Jackson escalated the cost of litigation by trying to enforce his rights to have a trial on the issue of debts, on the issue of child support, on the issue of custody. Those are important issues. But those issues, Your Honor, were things that he had a right to argue, things that he had a right to debate. That's the whole idea behind the process is to have those things happen. How did he justify putting $5,000 down on a $39,000 vehicle when he's not paying child support? Good question, Your Honor. I'm going to give you the answer. There were three cars, three vehicles, one used personally by Mr. Jackson, one used personally by Ms. Jackson, and one used by the business. Those were all tied to the loans on the house, the loan on the house. They were security for the loan on the house. When the house went belly up because they couldn't do that anymore, couldn't make those payments anymore, they had to turn in those cars. My client had to turn in both cars. What he did was he borrowed an old junker from his grandfather, I think it was, maybe it was his uncle he testified to, for a little while to go to these various car dealerships and do these auto detailing things. One of the car dealers said, in order for us to keep referring this business to you, you have to have something better. Here's a deal we'll make with you. When he did the down payment through them because they gave him enough business to make the down payment, he then turned around and kicked back money, 10% of that money, immediately to Ms. Jackson as well for no reason whatsoever other than to just give her some money. So he's trying to do the right thing, and Mr. Brandmeier's saying, oh, you're spending money frivolously. Mr. Johnston, the accountant, said Ms. Jackson screwed up the books when she had them, and Mr. Jackson was working diligently to get it back. Was he right? Was he perfect? Absolutely not, Mr. Johnston said. But I now have an idea, he said, as to where things are going because I've got better records from Mr. Jackson than I ever got from Ms. Jackson when she was running the business. Mr. Brandmeier talks about the business of, that she was locked out of the business. Ms. Jackson up and moved, moved in with her boyfriend. And when she moved in with her boyfriend, she took money out of the business account, $1,500 immediately. Didn't talk to Mr. Jackson about it, took it out of the account. So when Mr. Jackson decided to take her name off the account and change the locks, it was so that she wouldn't take more stuff, so that she'd stop taking things. That's the way Ms. Jackson operated, not just with the business, not with regard to the loans, but also with regard to their son. It was always about using those things as weapons against Mr. Jackson. The court did not realize that. I think in some respects it realized that both parties had issues and clearly did. But the court focused on this $750, which I think the court is dead wrong on. The reading of the order is very clear. It says, having reviewed the evidence presented, the court finds in its March 1st order that the most persuasive exhibit is exhibit 3, the 2008 corporate tax return. In March 08, he says, the parties are ordered to complete their tax returns for calendar years 2008 and 2009. Having heard the temporary issues, the court finds that the court's data proof is insufficient. So now the court is saying that I've heard all the temporary relief stuff, and I find that I don't have enough information to make a determination on child support. To me, Your Honor, that vacates the order. He's already said, I no longer can do that. I've now realized that 2008 tax return was wrong. What the court also didn't do, Your Honor, was it didn't make the determination as to who gets things like tip pro, who gets those debts. These cases that we cited, and that was the last point I had pointed out, indicate that they're supposed to be equitably apportioned. In this case, the parties have essentially an equal ability to pay. But nobody's paying the taxes, and nobody's paying the loans. And they're assuming, Ms. Jackson is, that those things should all be Mr. Jackson's also. And that that shouldn't affect his income either, that he shouldn't be able to save that either, that that affects his income either. In fact, what's happened here, Your Honor, is with Ms. Jackson operating the business financially, Mr. Jackson operating the business physically, that business went into the tank somewhere in the 2008 area. And they're now trying to find a way to make it recover. But there are a ton of debts out there that were incurred to try and keep that business afloat. And Ms. Jackson now wants to walk away from them. Mr. Jackson continuously did the things he should have done. Thank you, Your Honor.